1

2

3

4

5              UNITED STATES DISTRICT COURT

6         FOR THE NORTHERN DISTRICT OF CALIFORNIA

7                     OAKLAND DIVISION

8

9   SIEHNA M. COTTON, a minor, by and          Case No:  C 08-04386 SBA
    Megan McClure, her guardian ad litem; and
10  MARTIN COTTON, SR., an individual,          **ORDER GRANTING IN PART
                                                AND DENYING IN PART
11              Plaintiffs,                      DEFENDANTS' SUMMARY
                                                JUDGMENT MOTIONS**
12          vs.
                                                Docket 167, 178
13  CITY OF EUREKA, CALIFORNIA, a
    political subdivision of the State of California,
14  COUNTY OF HUMBOLDT, CALIFORNIA,
    a political subdivision of the State of
15  California, et al.,

16              Defendants.

17

18          The instant civil rights action under 42 U.S.C. § 1983 arises from the death of

19  Martin Cotton II ("Decedent"), who allegedly was beaten by police officers employed by

20  the City of Eureka Police Department and died hours later of a head injury while in custody

21  at the Humboldt County Correctional Facility ("HCCF").  The Decedent's father, Martin

22  Cotton, Sr., and the Decedent's minor daughter, Siehna M. Cotton, by and through her

23  guardian ad litem, bring the instant wrongful death and survival action, alleging federal

24  claims for excessive force, deliberate indifference to serious medical needs, municipal

25  liabilty and violation of their fourteenth amendment right to familial association, as well as

26  related state law causes of action.  The Defendants remaining in this action are the City of

27  Eureka ("City") and police officers Justin Winkle, Adam Laird, Gary Whitmer, Stephen

28  Watson and Tim Jones (collectively "City Defendants"), and the County of Humboldt

("County") and HCCF correctional officers ("C/O") Dennis Griffin, Chet Christensen, Fernando Cangas, Frances Morgan and Devin Strong (collectively "County Defendants").

The parties are presently before the Court on (1) the County Defendants' Motion for Summary Judgment/Adjudication, Dkt. 167, and (2) the City Defendants' Motion for Summary Judgment/Partial Summary Judgment, Dkt. 178. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS IN PART and DENIES IN PART both of these motions. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.   BACKGROUND

### A.   Factual Summary

#### 1.   Events at the Eureka Rescue Mission

On or about August 9, 2007, the Decedent was released from the custody of the HCCF for reasons not disclosed in the parties' papers. Sarmiento Decl. Ex. C at 24:23-2:2, Dkt. 189. Thereafter, Decedent made his way to the Eureka Rescue Mission ("Rescue Mission"). Galipo Decl. Ex. 1 at 13:1-3, Dkt, 185. The Decedent became involved in an altercation with another individual at the shelter and the police were summoned. Delaney Decl. Ex. H at 19:6-12, Dkt. 179. At around 4:40 p.m., Officers Laird and Winkle arrived at the Rescue Mission and observed the Decedent shove Brian Hall, manager of the Rescue Mission. Id. Ex. B at 81:22-25.

According to Plaintiffs, Officer Laird directed the Decedent to place his hands behind his back. After the Decedent did not comply quickly enough, the officers sprayed him in the face with pepper spray. Galipo Decl. Ex.1 at 19:1-7, 28:9-29:17; id. Ex. 2 at 16:19-17:7. Without provocation, Officer Winkle delivered a knee strike to the Decedent's midsection and pulled him to the ground. Id. Ex. 1 at 31:10-17, 34:16-20. Officer Winkle then delivered eight to nine full-force knee strikes to the right and left side of the Decedent's body and repeatedly shoved the Decedent's head into the cement sidewalk. Id. at 36:22-37:1, 44:14-16; 51:14-20, 65:8-12, 140:7-15. Officer Laird struck the Decedent

with his baton two to three times, and delivered three to four knee strikes.   Id. Ex. 2 at 23:25-24:4, 25:25-26:3, 33:9-34:17.  Officer Laird also kicked the Decedent multiple times.  Id. Ex. 2 at 57:18-58:12; 67:13-68:2.

Officer Whitmer was next to arrive at the scene.  Officer Whitmer struck the Decedent with his baton, sprayed him in the face with pepper spray, bent his wrist back and sat on him.  Id. Ex. 3 at 8:12-9:6; 18:15-25, 20:23-21:16; 60:24-61:20.  Witness Michael Gage observed Officer Whitmer run up to the Decedent while he was on the ground and deliver a strong kick to his body.  Id. Ex. 5 at 16:17-18:4; 41:17-42:10.  Mr. Gage and another witness, Louise Valente, both saw the officers repeatedly striking Mr. Cotton in the head.  Id. Ex. 5 at 18:23-19:4; id. Ex. 6 ¶ 8.  However, at no time did the Decedent threaten or attack the officers.  Id. Ex. 2 at 82:1-7; 82:8-10; Delaney Decl. Ex. D at 20:10-14.

When Officer Watson arrived at the Rescue Mission, he made his way through the crowd that had gathered and observed the Decedent engaged in a struggle with Officers Laird, Winkle and Whitmer.  Watson Decl. ¶ 3, Dkt. 181.  Within a "matter of seconds" of reaching the scene, he observed Officer Laird apply three baton strikes to the Decedent's lower legs.  Id.  Another officer asked Officer Watson for assistance in handcuffing the Decedent and to place a spit mask on him.  Id.  The spit mask is a thin, sheer mesh mask that prevents spitting but allows the individual to breathe.  Id. ¶ 6; Supp. Laird Decl. Ex. B (exemplar of spit mask), Dkt. 199.  Even though a spit mask had been placed on him, the Decedent continued to yell at the officers.  Id.

By the time Officer Jones arrived on scene, the Decedent was handcuffed and had a spit mask over his face.  Jones Decl. ¶ 2, Dkt 180.  He did not observe the other officers apply any force to the Decedent other than compliance holds.  Id. ¶ 3.  To control the Decedent while he was being searched, Officer Jones used his nunchakus (a martial arts weapon consisting of two sticks connected by a short chain or rope) to the Decedent's forearm and wrists.  Id. ¶ 4.  Officer Jones did not intend to cause injury to the Decedent nor did he observe any such injuries.  Id. ¶¶ 4-5.

The police officers tell a different story.  They claim that upon contacting the Decedent, he raised his hands and refused to submit to their authority.  Delaney Decl. Ex. B at 40:12-16; id. Ex. C at 23:19-24:16, 25:11-27:1, 28:8-19.  A witness to the incident stated that the Decedent appeared to not comply with the officers' command to "give up [his] arm" and saw him spit at them.  Id.. Ex. D at 15:23-16:2, 18:17-22, 19:25-20:10, 20:18-22, 21:17-19.  Although the officers applied pepper spray, it appeared to have no effect on the Decedent, leading them to believe that he was under the influence of methamphetamine. Id. Ex. B at 48:23-49:6, 124:15-21.[1]

### 2.      Decedent's Detention at HCCF

#### a)      *Events Following Arrival at the HCCF*

Despite the physical force used against the Decedent, neither Officer Laird nor any other City police officer called for medical assistance.  Galipo Decl. Ex. 1 at 60:6-61:7. Instead, with the Decedent in the back of his patrol car, Officer Laird followed Officer Winkle to the HCCF, which was located several blocks away.  Id. at 70:1-19.  Over the radio, Officer Whitmer offered to follow Officer Laird to the hospital since Officer Laird's shift ended at 5:00 p.m.  Id. Ex. 3 at 108:10-21.  Officer Whitmer made this offer because he did not know whether the HCCF would accept the Decedent due to the baton strikes he received and the application of pepper spray.  Id. at 108:22-109:25.  Though not clear from the record, Officer Laird apparently declined the offer, as he took the Decedent directly to the HCCF.  Id. Ex.1 at 70:16-22.

The officers pulled their vehicles into the sally port, which is an underground parking structure below the HCCF where prisoners are received.  Id. at 76:9-24.  They were met by several HCCF C/Os, including C/Os Christensen, Cangas and Griffin.  Sarmiento Decl. Ex. B at 20:2-9; Cangas Decl. ¶ 1, Dkt. 171; Christensen Decl. ¶ 3; Sarmiento Decl. Ex. D at 90:23-91:3.  C/Os Christensen and Griffin were aware that the Decedent had previously been housed at the HCCF in an area for persons with mental issues.  Sarmiento

---

[1] A subsequent toxicology report showed that, in fact, the Decedent had a large amount of LSD in his system.  Id. Ex. G at 15:22-16:14.

Decl. Ex. D at 91:10-92:14; id. Ex. C at 25:9-12.  While the Decedent remained in the

patrol car, Officers Laird and Winkle informed C/O Christensen that they had "struggled

very hard" with the Decedent to place him in handcuffs and that he had been subjected to

baton strikes.  Sarmiento Decl. Ex. C at 29:17-25, 30:7-11.  Though Plaintiffs assert that

Officer Laird "believes that he [also] informed the correctional officers of the use of pepper

spray, kicks [and] knee strikes," Pls.' Opp'n at 3, Dkt. 187, Officer Laird, in fact, testified

that he had no recollection of whether he communicated such information, Sarmiento Decl.

Ex. E at 86:16-87:3; see also Bragg Decl. Ex. C. at 80:5-12, Dkt. 195; id. Ex. B at 30:1-6.

C/O Christensen instructed the Decedent to exit the patrol car.  Christensen Decl.

¶ 2.  After the Decedent failed to comply, C/O Christensen physically pulled him from the

vehicle and stood him up.  Id. ¶ 3.  During this time period, the C/Os observed that the

Decedent was combative and yelling, and believed that he was under the influence of

unknown drugs due to his "bizarre" behavior.  Id.; Cangas Decl. ¶ 1.  In response to the

Decedent's behavior, C/O Cangas placed the Decedent in a wrist lock, which is a standard

procedure applied to combative prisoners.  Cangas Decl. ¶ 1.

Several C/Os then brusquely escorted the Decedent to the interior of the HCCF into

the pre-booking area at around 4:59 p.m.  Galipo Decl. Ex. 1 at 76:19-77:11; Sarmiento

Decl. Ex. A (Camera3 at 16:58:57).  At that time, the Decedent was wearing a dark long-

sleeve hooded pullover and dark pants.  Sarmiento Decl. Ex. A (Camera 3 at 16:58:57).

Once in the pre-booking area, the C/Os pushed the Decedent against a padded "blue mat"

which was affixed to the wall, where they held him momentarily.  Galipo Decl. Ex. 1 at

77:7-11; Sarmiento Ex. A (Camera 3 at 16:59:02).[2]  After leaving the pre-booking area, the

C/Os escorted the Decedent through the processing area directly to a sobering cell, which

_____

[2] Plaintiffs submitted a DVD containing footage taken by surveillance cameras
placed throughout the HCCF.  Camera 1 shows the sally port (parking garage) area;
Camera 3 shows the pre-booking area; Camera 6 shows the area outside the sobering cell in
which the Decedent was placed; Camera 10 shows the interior of the sobering cell; and
Camera 16 shows the processing area, adjacent to the pre-booking area.  Sarmiento Decl.
Ex. A.  The Court has reviewed the footage in connection with the County Defendants'
motion.

was located nearby.  The time-stamp on the video shows that the C/Os placed the Decedent

in a sobering cell at around 5:00 p.m.  Sarmiento Decl. Ex. A.  The video surveillance

footage shows several C/Os bringing the Decedent into the sobering cell, where they placed

him on the ground and removed some of his excess, outer clothing.  Sarmiento Decl. Ex. A

(Camera 10 at 17:00). [3]  There is nothing in the video footage depicting that any of the C/Os

struck, kicked or applied any force against the Decedent, other than to restrain him briefly.

During this time period, the Decedent remained combative, continued to yell obscenities

and was not compliant.  Meyers Decl. ¶¶ 2-3, Dkt. 3.  C/O Leland Meyers, who is not a

defendant in this action, was present and placed his taser on the Decedent's back as a

precautionary measure.  Id. ¶ 3.  However, he did not actually discharge the taser.  Id.

Placement in a sobering cell is standard HCCF operating procedure when the

detainee is believed to be under the influence of alcohol or drugs.  Morgan Decl. ¶ 1, Dkt.

173; see also Rossiter Decl. Ex. D at 1 (procedures applicable to use of sobering cells), Dkt.

169.  Such policies also specify that, "No inmate will be placed in a sobering cell without a

Medical Screening Assessment completed in accordance with [Policy and Procedure] H-

002."  Rossiter Decl. Ex. D at 2.  In the Decedent's case, he was taken directly from sally

port to a sobering cell without having medical screening or assessment having been

completed.  Though a C/O attempted to elicit medical information from the Decedent, he

---

[3] In passing, Plaintiffs vaguely assert that the Decedent's "clothing" was removed at some unspecified point in time.  Pls.' Opp'n at 2.  However, Plaintiffs fail to provide any citations to the record to support this assertion, in contravention of Rule 56.  See Fed. R. Civ. P. 56(c)(1)(A) (requiring specific citations to the record).  In addition, the Court notes that video surveillance recording provided to the Court by Plaintiffs shows that the Decedent was clothed from the time of his arrival at the HCCF until his placement in the holding cell.  See Sarmiento Decl. Ex. A.  The video shows that when the Decedent was taken from the sally port into the pre-booking area, he was wearing dark pants and a dark, long-sleeve hooded shirt or sweatshirt.  Id. (Camera 3 at 16:57; Camera 16 at 16:57).  In the sobering cell, he initially is shown in the same dark clothing.  Id. (Camera 10 at 16:59).  For several minutes, approximately seven officers are in the cell with the Decedent, several of whom appear to be restraining him on the ground.  Id.  At 17:02, the C/Os removed what appear to be dark-colored pants, and at 17:06 they removed what appears to be the Decedent's pullover.  Id. at 17:02, 17:06.  After all of the officers left the cell at approximately 17:07, the Decedent is shown wearing a white long-sleeve shirt and white full length pants.  Id.  When the officers found the Decedent unresponsive in his cell, he was still clothed in that manner.  Id. (Camera 10 at 18:56).

1   failed to respond to their questions.  Sarmiento Decl. Ex. B at 75:10-19.  Thus, the C/O

2   collectively decided to place the Decedent in a sobering cell to sleep off whatever substance

3   was in his system.  Sarmiento Decl. Ex. C at 44:11-45:10; Christensen Decl. ¶ 8; Cangas

4   Decl. ¶ 5; Griffin Decl. ¶ 7.  C/O Cangas claims that inmates are placed in sobering cells

5   "all the time" without a medical assessment.  Sarmiento Decl. Ex. C at 75:14-16.

6                              *b)*     ***Cell Checks***

7            HCCF procedures specify that cell checks of detainees placed in a sobering cell be

8   conducted every fifteen minutes and that their observations be recorded on an Observation

9   Log.  Rossiter Decl. Ex. E at 4.  The Observation Log shows nine entries beginning at 1715

10  (5:15 p.m.) by C/Os Griffin, Cangas, Christiansen, Morgan, Rossiter and Strong.  Id. Ex. A.

11  Each of the C/Os claim that they did not notice anything unusual or that would indicate that

12  Decedent required medical care.  Griffin Decl. ¶¶ 4, 5; Cangas Decl. ¶ 6; Christensen Decl.

13  ¶ 9; Morgan Decl. ¶ 4; Rossiter Decl. ¶ 9; Strong Decl. ¶ 3, Dkt. 174.  The video

14  surveillance footage of the Decedent while in the sobering cell, shows that shortly after the

15  C/Os placed him in the cell at 16:59:49, he began rolling around on the floor and grabbing

16  his head, ostensibly in distress.  Sarmiento Decl. Ex. A (Camera 10).  However, the

17  recording stops at 17:31:41 while the Decedent is still rolling around on the ground.  Id.[4]

18  After approximately an hour and one-half gap, the recording resumes at 18:56:31.  At this

19  point, however, the Decedent is lying motionless, face down, directly in front of the cell

20  door.  Id. (Camera 10 at 18:56:31).

21           While conducting his second cell check, C/O Strong noticed that the Decedent was

22  lying on the floor.  Strong Decl. ¶ 3.  Though he was not moving, the Decedent appeared to

23  be breathing.  Id.  Another detainee in a nearby sobering cell began yelling and screaming,

24  at which point C/O Strong briefly went to the other cell to assess the situation.  Id.  He then

25  returned to the Decedent's cell to make sure he was okay, and found him in the same

26

27           [4] The County Defendants claim that the cell camera is "set up to capture movement"
    and that there is an hour and one-half gap in the recording because "there was no motion in
28  the cell."  Sarmiento Decl. Ex. N at 17:10-21.

position as before.  Id.  C/O Strong banged on the door to see if the Decedent was asleep.
Id.  After receiving no response, he called two other C/Os and entered the cell, where they
found the Decedent non-responsive.  Id.  C/O Strong obtained an oxygen tank and mask,
which were utilized in conjunction with Cardio Pulmonary Resuscitation efforts.  Id.  A
nurse arrived within minutes and took over efforts to revive the Decedent, but to no avail.
Id.  The County Coroner's autopsy report later concluded that the Decedent died of acute
subdural hematoma (i.e., pooling of blood on the surface of the brain) caused by blunt force
trauma.  Sarmiento Decl. Ex. I at 3.

### B.    PROCEDURAL HISTORY

Plaintiffs, as survivors-in-interest, filed the instant action against the City
Defendants and the County Defendants based on their respective roles in the underlying
events of August 9, 2007.  The operative pleading is the First Amended Complaint ("FAC")
filed on May 21, 2009, which alleges eight causes of action, styled as follows:  (1) violation
of 42 U.S.C. § 1983 based on the use of excessive force against the City Defendants;
(2) violation of § 1983 for deliberate indifference to serious medical needs against all
Defendants; (3) supervisory liability against the City and the County under 42 U.S.C.
§ 1983; (4) assault and battery against the City Defendants; (5) violation of California
Government Code § 845.6 against the City Defendants; (6) wrongful death against all
Defendants; (7) survival damages against all Defendants; and (8) violation of § 1983 for
interference with familial association under the fourteenth amendment against all individual
Defendants.

Trial was scheduled to commence on January 10, 2011, with the pretrial conference
to take place on December 14, 2010.  Dkt. 139.  In anticipation of the pretrial conference,
the parties filed thirty-three motions in limine, which the Court adjudicated in a written
order issued on December 14, 2010.  Dkt. 147.  On the same date, the Court held a pretrial
conference, at which time the Court vacated the trial date and referred the matter to
Magistrate Judge Zimmerman for a mandatory settlement conference.  Dkt. 148, 149.  After
the case did not settle, the Court rescheduled the pretrial conference to September 6, 2011,

and set a new trial date of September 12, 2011.  Dkt. 161.  Since the trial date was not scheduled to commence for several months, the Court issued a scheduling order granting Defendants leave to file motions for summary judgment.  Dkt. 162.[5]  In accordance with the Court's scheduling order, the County Defendants filed a motion for summary judgment with respect to all claims alleged in the FAC. Dkt. 167.  The City Defendants have filed a motion for partial summary judgment with respect to some, but not all, of the claims alleged against them.  Dkt. 178.[6]  The motions have been fully briefed and are ripe for adjudication.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P. 56(a)(1).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The movant bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record").  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

---

[5] The Court had previously declined to hear the County Defendants' motion for summary judgment beyond the law and motion cut-off.  Dkt. 80.

[6] Plaintiffs filed evidentiary objections to the declarations of Dale Walker and Adam Laird, Dkt. 202, while the County Defendants filed objections to the declaration of Roger Clark, Dkt. 196.  However, the Court's ruling is not predicated upon the evidence in dispute.  Therefore, the objections are overruled as moot.

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting in part Scott v. Harris, 550 U.S. 372, 380 (2007)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  A factual disputes is genuine if it "properly can be resolved in favor of either party."  Id. at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).  Only admissible evidence may be considered in ruling on a motion for motion for summary judgment.  Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

## III.   COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.   EXCESSIVE FORCE

#### 1.   Applicable Law

The County Defendants move for summary judgment on Plaintiffs' first claim for excessive force, pursuant to 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must allege and prove two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  Liability may be imposed on an individual defendant under 42 U.S.C. § 1983 if the plaintiff can show that the defendant proximately caused the deprivation of a federally protected right.  See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988).  A person deprives another of a constitutional right within the meaning of § 1983 if he or she engages in an affirmative act, participates in another's affirmative act or omits to perform an act which he is legally required to do, that causes the deprivation of which the plaintiff complains.  Id. at 633.

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures.  See Graham v. Connor, 490 U.S. 386, 394 (1989).  "[T]he reasonableness inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397.  Under Graham, the reasonableness of the officer's conduct is based on the consideration of three factors:  (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the police or others, and (3) whether the suspect is fleeing or resisting arrest.  See Brooks v. City of Seattle, 599 F.3d 1018, 1025 (9th Cir. 2010).  In considering an excessive force claim, the court is to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham, 490 U .S. at 396; Lolli v. County of Orange, 351 F.3d 410, 415 (9th Cir. 2003).

### 2.    Analysis

As a threshold matter, the FAC does not allege a claim for excessive force against any of the County Defendants.  The only defendants named in Plaintiffs' excessive force claim are the individual City police officers.  See FAC ¶¶ 32, 40.  Plaintiffs have not requested or been granted leave to amend their pleadings to allege an excessive force claim against the County Defendants.  Nor can Plaintiffs belatedly attempt to interject an excessive force claim into the action by presenting such allegations in their opposition brief.  See Pickern v. Pier 1 Imps. (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to assert new specific factual allegations in support of a claim when they were "presented for the first time in [the plaintiff's] opposition to summary judgment"); Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (quotation marks omitted).  As such, the Court finds that no excessive force claim is pending against the County Defendants.

The question remains whether the Court should permit Plaintiffs to proceed on a claim for excessive force against the County Defendants, based on the allegations contained in their opposition brief. "[W]hen issues are raised in opposition to a motion [for] summary judgment that are outside the scope of the complaint, the district court should … construe[] the matter raised as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time." Apache Survival Coalition v. United States, 21 F.3d 895, 910 (9th Cir. 1994) (internal brackets and quotation marks omitted). Leave to amend under Rule 15(b) is a matter of the Court's discretion, based upon consideration of the following factors: "bad faith, undue delay, prejudice to the opposing party, and the futility of amendment." Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994). For the reasons that follow, the Court finds that it would be futile to allow Plaintiffs to proceed on an excessive force claim against the County Defendants.

Plaintiffs argue that C/O Christensen used excessive force by physically removing the Decedent from Officer Laird's patrol car, and that both he and C/O Cangas used excessive force by placing the Decedent in wrist holds and subsequently pushing him into the "blue mat" in the pre-booking area. Pls.' Opp'n at 4, 17-18.[7] However, C/O Christensen removed the Decedent from the patrol car only after the Decedent refused to comply with his command to exit the vehicle. Christensen Decl. ¶ 3. There is no evidence that the amount of force used by C/O Christensen was excessive or abusive. In fact, by all accounts, it is undisputed that C/O Christensen simply brought the Decedent to a standing position. Galipo Decl. Ex. 1 at 76:15-21. The use of compliance holds was justified and reasonable given the uncontroverted evidence that the Decedent was obstructive, aggressive and non-compliant. Sarmiento Decl. Ex. B at 25:3-19; id. Ex. C at 36:5-7; id. Ex. D at 62:8-21; Christensen Decl. ¶¶ 3-5; Cangas Decl. ¶ 1. As for pushing the Decedent against the blue mat in the pre-booking area, no reasonable jury would find, based on the facts

---

[7] Though not described by the parties in their papers, the "blue mat" is depicted in the video surveillance footage, and appears to be a large, pliable mat affixed against the wall in the room adjoining the parking garage to the HCCF. See Sarmiento Decl. Ex. A (Camera 3 at 16:57).

presented, including the video surveillance footage, that the C/Os violated the Decedent's constitutional rights based on this conduct.

Under the totality of the circumstances, the Court finds that C/Os Cangas, Christensen and Griffin's conduct did not amount to a constitutional violation. See, e.g., Luchtel v. Hagemann, 623 F.3d 975, 980-82 (9th Cir. 2010) (affirming summary judgment for police officers who pinned the plaintiff to the ground while handcuffing her where it was undisputed that she was resisting arrest); Draper v. Reynolds, 369 F.3d 1270, 1278 (9th Cir. 2004) (no excessive force when officer used Taser to effect the arrest of an uncooperative suspect for a traffic violation); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 921-22 (9th Cir. 2001) (no excessive force when physical force was used to handcuff suspect who refused to cooperate with an officer's requests for identification and stiffened her arm and attempted to pull free from the officer); Forrester v. City of San Diego, 25 F.3d 804, 807-808 (9th Cir. 1994) (finding no excessive force when painful compliance holds were used against passively resisting demonstrators). As for the other HCCF officers, there is no evidence or specific allegation that they used any force on the Decedent. See Griffin Decl. ¶ 4, Dkt. 172; Strong Decl. ¶ 3; Dkt. 174; Morgan Decl. ¶¶ 4, 7, Rossiter Decl. ¶ 4.

Plaintiffs next contend that the County Defendants used excessive force on the Decedent when they placed him in the sobering cell and allegedly used a taser on him. Pls.' Opp'n at 6-7, 17. Again, since these claims are not alleged in the pleadings, they are not properly before the Court. See Schneider v. Calif. Dep't of Corrections, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). But even if they were, they are completely lacking in evidentiary support. As discussed above, the Decedent was uncooperative and disruptive from the time he arrived at the HCCF until his placement in the sobering cell. The Court's review of the surveillance footage confirms that the C/Os application of compliance holds to restrain the Decedent was justified and reasonable, and no reasonable jury would conclude otherwise.

Lastly, with regard to the taser, Plaintiffs have presented no evidence to controvert C/O Myers' statement that he did not actually use the taser on the Decedent. Tellingly,

Plaintiffs do not directly confront C/O Myer's declaration, and instead, rely on the declaration of their use of force expert, Roger Clark. Clark Decl. ¶ 18, Dkt. 188. Mr. Clark opines that the video surveillance recording made while the Decedent was in the holding cell "shows that the HCCF Officers use of a C26 Taser." Id. However, after reviewing the surveillance video, the Court finds that there is no evidence that a taser was used on the Decedent. Sarmiento Decl. Ex. A. To the contrary, after the correctional officers left the holding cell, the video shows that the Decedent continued to move about the cell, which further supports the County Defendants' contention that C/O Myers did not activate his taser. In addition, there is no mention in the autopsy report of the possibility that a taser had been used on the Decedent. Id. Ex. I. Based on the record presented, the Court finds no factual basis to support Plaintiffs' unpled assertion that the County Defendants' used a taser on the Decedent and that such use amounts to excessive force.

In sum, the Court finds no basis for Plaintiffs' putative claim for excessive force against the County Defendants. Accordingly, Plaintiffs' request for leave to amend under Rule 15(b) is DENIED, and the County Defendants' motion for summary judgment with respect to Plaintiffs' first claim for relief is DENIED AS MOOT.

### B. DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

#### 1. Overview

A pretrial detainee has a constitutional right to adequate medical care, which derives from the substantive due process clause of the Fourteenth Amendment. Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002). "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). To establish a claim for deliberate indifference to serious medical needs, the plaintiff must show (1) "a serious medical need by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations and citations omitted). The second prong of this standard "is satisfied by showing (a) a purposeful act or failure to

1  respond to a prisoner's pain or possible medical need and (b) harm caused by the

2  indifference."  Id.  Indifference "may appear when prison officials deny, delay or

3  intentionally interfere with medical treatment, or it may be shown by the way in which

4  prison physicians provide medical care."  Id.

5  The test for determining the defendant's awareness of a serious medical need is a

6  subjective one.  Toguchi, 391 F.3d at 1057.  Thus, the mere presence of circumstances from

7  which a reasonable person could infer "an excessive risk to inmate health or safety" is

8  insufficient; rather, the official must actually make the inference and disregard it.  Farmer

9  v. Brennan, 511 U.S. 825, 837 (1994)).  "Whether a prison official had the requisite

10  knowledge of a substantial risk is a question of fact subject to demonstration in the usual

11  ways, including inference from circumstantial evidence,… and a factfinder may conclude

12  that a prison official knew of a substantial risk from the very fact that the risk was

13  obvious."  Id. at 842; see also Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003)

14  ("Much like recklessness in criminal law, deliberate indifference to medical needs may be

15  shown by circumstantial evidence when the facts are sufficient to demonstrate that a

16  defendant actually knew of a risk of harm.").  Mere negligence, or even gross negligence, is

17  insufficient to establish deliberate indifference.  Toguchi, 391 F.3d at 1060.  If the

18  defendant "should have been aware of the risk," but nevertheless was not actually aware,

19  the defendant "has not violated the Eighth Amendment, no matter how severe the risk."  Id.

20  at 1057.

21  Here, the County Defendants contend that the Decedent never requested medical

22  treatment and deny that they were aware that the Decedent required immediate medical

23  attention.  Cangas Decl. ¶ 3; Christensen Decl. ¶ 10; Griffin Decl. ¶ 6; Morgan Decl. ¶ 8;

24  Strong Decl. ¶ 7.  In response, Plaintiffs counter that the C/Os "knew or should have

25  known" that the Decedent was in need of medical care based on his "obvious" injuries,

26  awareness that he had been beaten by the City police officers and their observations of the

27  Decedent while in their custody.  Pls.' Opp'n at 2, 11-12.  To properly evaluate a deliberate

28  indifference claim involving multiple parties, the Court must address the evidence as it

- 15 -

relates specifically to each individual defendant.  See Leer, 844 F.3d at 634 (requiring "specific facts as to each individual defendant's deliberate indifference").  Ignoring this requirement, Plaintiffs conflate the analysis of all individual County Defendants, and broadly assert that the Decedent's need for medical attention was manifest.  Because of the infirmity of Plaintiffs' analytical approach, the Court addresses the evidence as to each County Defendant.[8]

### 1.    C/O Griffin

At the time of the incident, C/O Griffin was a Correctional Supervisor.  Griffin Decl. ¶ 1.  He, along with C/Os Christensen and Cangas, escorted the Decedent from the sally port into the pre-booking area.  Id. ¶ 3.  Since the other C/O's were tending to the Decedent, however, C/O Griffin left the pre-booking area to go the processing area, to ensure that someone was present to answer the telephones.  Sarmiento Decl. Ex. D at 119:2-11.  At some point after the Decedent was brought to the sobering cell, C/O Griffin went down the hall and "looked in" as the other C/Os were removing the Decedent's handcuffs and outer clothing.  Id. at 119:12-24.  C/O Griffen also made the initial entry on the Observation Log at 1715, with the notation, "Admitted – extremely combative." Rossiter Decl. Ex. A.

Plaintiffs contend that C/O Griffen was deliberately indifferent in failing to ensure that the Decedent was medically screened or assessed, given the Decedent's "obvious" injuries.  Pls.' Opp'n at 2, 13, 14.  This contention is misplaced.  Although the Decedent may not have been medically screened or assessed in accordance with HHCF policy, such failure, standing alone, does not establish a constitutional violation.  See Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043 (9th Cir. 2002) ("Failure to follow prison procedures …

---

[8] The Court also notes whether the individual County Defendants "knew or should have known" of the Decedent's immediate need for medical care is insufficient to establish a claim for deliberate indifference.  Farmer, 511 U.S. at 837, 842.  Rather, the Court must determine whether Plaintiffs' showing is sufficient to demonstrate a triable issue of fact whether the individual County Defendants were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and actually drew such an inference.  Id. at 837.

1   was certainly negligent; but negligence, or failure to avoid a significant risk that should be

2   perceived but wasn't, 'cannot be condemned as the infliction of punishment.'") (quoting in

3   part <u>Farmer</u>, 511 U.S. at 838).  As for the Decedent's injuries, Plaintiffs have failed to

4   present any evidence that such injuries were sufficiently obvious during the time period that

5   C/O Griffin had contact with the Decedent that a jury could infer that he knew that the

6   Decedent required immediate medical attention.  Except for the upper lip abrasion and cuts

7   on his right hand, the Decedent's injuries were covered by his clothing from the time of his

8   arrival at the HCCF until he was found unresponsive in the sobering cell.  As for visible

9   injuries, Plaintiffs have made no showing that they were sufficiently serious or noticeable

10  such that he or any other C/O would be aware that the Decedent had a serious medical

11  condition requiring immediate attention.[9]

12      Next, Plaintiffs contend that C/O Griffin was aware of Plaintiffs' serious medical

13  needs based on Officer Laird's having "informed [him] of the use of pepper spray, kick,

14  knee strikes, and baton strikes."  Pls.' Opp'n at 11.  The evidentiary citations provided by

15  Plaintiffs do not support these assertions.  During his deposition, Officer Laird testified

16  repeatedly that he did not recall mentioning to anyone at the HCCF about the Decedent

17  having been kicked, subjected to knee strikes or sprayed with pepper spray.  <u>Id.</u> Ex. E at

18  86:1-87:22.[10]  Nor is there evidence demonstrating C/O Griffin's awareness that the City

19  police officers kicked and used knee strikes against the Decedent.  Indeed, the Booking

20  Request form prepared by Officer Laird and provided to HCCF staff makes no mention that

25  [9] Plaintiffs claim that there were injuries to the Decedent's forehead, but there is no
26  mention of such injuries in the autopsy report.  Sarmiento Decl. Ex. I.  Such bruising also is
    not apparent from the autopsy photographs.  <u>Id.</u> Ex. J.

27  [10] Likewise, C/O Christensen recalls only that he was informed about the baton
    strikes, Sarmiento Decl. Ex. C at 29:15-22, but could not "remember hearing anything
28  about pepper spray," <u>id.</u> at 30:7-11.

1   the Decedent had been subjected to any force or that he required medical attention.

2   Christensen Decl. Ex. A.[11]

3       Equally misplaced is Plaintiffs' attempt to make much of C/O Griffin's

4   acknowledgment that he recognized that the Decedent had previously been housed at the

5   HCCF in an area reserved for persons with mental issues.  Sarmiento Decl. Ex. D at 91:10-

6   92:14.  The Ninth Circuit has recognized that the mere awareness of a prisoner's mental

7   health status is insufficient to support the inference that the prison official was necessarily

8   aware of an immediate need for medical attention.  See Simmons v. Navajo County, Ariz.,

9   609 F.3d 1011, 1018 (9th Cir. 2010) (holding that nurse who was aware that the decedent

10  suffered from depression and previously attempted suicide and was at risk for making

11  another attempt to commit suicide did not support inference that she knew that the decedent

12  was at an "acute" risk of harm).  In addition, given that the Decedent died from injuries

13  allegedly resulting from the force applied by the individual City Defendants, it is unclear

14  how the C/Os' alleged awareness of the Decedent's mental health issues is sufficient to

15  establish their subjective awareness of an acute need to address his physical injuries.

16      More problematic, however, is the evidence concerning Decedent's placement in a

17  sobering cell and the subsequent cell checks.  HCCF's Internal Policies and Procedures

18  specify that "[n]o inmate will be placed in a sobering cell without a Medical Receiving

19  Screening assessment completed in accordance with [HCCF internal Policies and

20  Procedures]."  Rossiter Decl. Ex. D.  The Policies and Procedures governing "Safety

21  Checks" specifies that detainees placed in sobering cells should be checked every fifteen

22  minutes.  Id. Ex. E at 3.  C/Os are directed to conduct safety checks through direct visual

23

---

24  [11] Also misplaced is Plaintiffs' related contention regarding Officer Whitmer. Notwithstanding Plaintiffs' claims to the contrary, Officer Whitmer did not testify at his deposition that "[he] believed that [the Decedent] should have been medically cleared."

25  Pls.' Opp'n at 11, 4).  Rather, Officer Whitmer stated that he thought the Decedent would be medically cleared by HCCF staff because he was being "combative and resistive."

26  Sarmiento Decl. Ex. P at 107:4-20.   In any event, the salient question is what the C/Os subjectively knew, and Officer Whitmer's personal beliefs have no bearing on their state of

27  mind—particularly given the lack of any evidence establishing that any information was conveyed by Officer Whitmer (who did not transport the Decedent to the HCCF) to C/O

28  Griffin or anyone else at the HCCF.

observation in order to allow them "to physically see and hear if an inmate is OK and not having difficulty breathing." Id. at 1.  The C/O must record his or her observations on the "Observation Log" posted outside the cell. Id. Ex. E at 3.  The observations are to "reflect the specific activity presented by the inmate. Id.

Here, the Court finds that there is a triable issue of fact regarding whether C/O Griffin was deliberately indifferent to the Decedent's serious medical needs.  At 1715 (5:15 p.m.), C/O Griffin made his the initial entry into the Observation Log, where he noted, "Admitted—extremely combative."  The video at 17:15 shows C/O Griffin looking through the window in the Decedent's cell door.  The contemporaneous surveillance footage showing the Decedent inside the cell shows him rolling around on the ground throughout the cell while grabbing his head.  Sarmiento Decl. Ex. A (Cameras 6, 10 at 17:15:20).  Yet, C/O Griffin did not open the cell door to check on the Decedent, summon medical assistance or engage in any other action to ensure that the Decedent was "OK," as required by the HCCF's internal policies.  Thus, construing the evidence in a light most favorable to Plaintiffs, the Court finds that a trier of fact could conclude that C/O Griffin was aware of, but ignored, the Decedent's need for immediate medical attention.  The Court therefore DENIES the County Defendants' motion for summary judgment with respect to Plaintiffs' claim for deliberate indifference against C/O Griffin.

### 2.      C/O Cangas

C/O Cangas was present in the sally port to take custody of the Decedent, and later conducted two cell checks.  The Observation Log indicates that C/O Cangas conducted his first cell check at 1738 (5:38 p.m.), and noted as his observation, "Moving  OK."  Rossiter Decl. Ex. A.  This cell check is documented by the surveillance recordings taken from Camera 6 (hallway in front of the cell) and Camera 10 (interior of the cell). At about 17:29:17 on the recording, Camera 10 shows C/O Cangas walking up to the Decedent's cell and peering into to cell through the narrow window in the door.  Sarmiento Decl. Ex. A

(Cameras 10 at 17:29:17).[12]  At the same time, the camera from inside the cell shows C/O Cangas at the cell door window.  Id. (Camera 6 at 17:29:17).  While C/O Cangas is at the door, the camera shows the Decedent rolling around and writhing on the floor in what appears to be a violent or distressed manner.  Id.  But instead of opening the door to check on the Decedent, C/O Cangas is seen walking away from the cell and making a written entry on a nearby bulletin board.

C/O Cangas is then seen returning to the cell window, where the Decedent still is in apparent distress, only to leave again and return to the bulletin board.  Id. (Camera 6, 10 at 17:29:51).  While C/O Cangas is at the bulletin board the second time, another C/O, who also was at the board area with C/O Cangas, is shown walking away, down the hall past the Decedent's cell.  While the unidentified C/O is about to pass the Decedent's cell door, he stops, turns his head towards the Decedent's cell, and then walks up to the cell door to look inside.  Id. (Camera 10 at 17:29:58).  Moments later, he is joined by C/O Cangas, who also looks through the cell door window.  Id.  After briefly observing the Decedent continue to roll around, both of the C/Os walk away from the cell door.  Id.

Construing the evidence in a light most favorable to the Plaintiffs, the Court finds that there are triable issues of fact regarding whether C/O Cangas was deliberately indifferent to the Decedent's serious medical needs.  On three occasions, C/O Cangas looked through the cell door and could see that the Decedent was in apparent physical distress, but did nothing in response.  Notably, the surveillance video shows that the unidentified C/O was about to walk past the Decedent's cell, but suddenly stopped and walked up to look into the cell, as if something had caught his attention.  It was at this juncture that C/O Cangas joined the other C/O and observed the Decedent in apparent distress for a third time.  A reasonable trier of fact could conclude from the video that both C/Os, and C/O Cangas in particular, were subjectively aware that the Decedent was in

_____

[12] Plaintiffs contend, and the County Defendants do not dispute, that the time stamps on some of the surveillance recordings do not correspond to the times entered on the Observation Log.  Thus, for example, the entry on the Observation Log reads "1738," while the surveillance camera shows "17:29."

1   distress.  Accordingly, the Court DENIES the County Defendants' motion for summary

2   judgment with respect to C/O Cangas.[13]

3               **3.     C/O Christensen**

4           Like C/Os Griffin and Cangas, C/O Christensen was present in the sally port to

5   receive custody of the Decedent.  The record shows that after the Decedent refused to

6   comply with his command to exit the patrol car, C/O Christensen physically removed the

7   Decedent from the vehicle and escorted him with other C/O's into the HCCF, where he was

8   placed in a sobering cell.  C/O Christensen claims that he had no knowledge that the

9   Decedent needed medical attention, and believed that the Decedent's obstructive and

10  "bizarre" behavior was attributable to his being under the influence of an unknown drug.

11  Christensen Decl. ¶ 3.  In addition, C/O Christensen states that he performed one cell check

12  "by looking into his cell through the window in the door," and "observed [the Decedent]

13  sitting and saw nothing that made [him] believe that he needed medical care."  Christensen

14  Decl. ¶ 9.

15          Although C/O Christensen may not have known of Decedent's particular injuries or

16  that he had been subjected to physical trauma, there is circumstantial evidence that C/O

17  Christensen knew that Decedent needed medical treatment based on his behavior while in

18  the sobering cell.  C/O Christensen made a notation on the Observation Log at "1755" (5:55

19  p.m.) that he saw the Decedent "moving" and "breathing."  Rossiter Decl. Ex. A; Sarmiento

20  Decl. Ex. C at 54:10-56:22.  However, at 1755, the video surveillance footage is blank,

21  which Defendants have attributed to "no motion in the cell."  Sarmiento Decl. Ex. N at

22  17:10-21.  Defendants offer no explanation for this discrepancy, other than to dismiss it as

23  being nothing more than a "subjective call."  Defs.' Reply at 8.  That "subjective call,"

24  however, is more appropriately decided by the trier of fact, rather than by the Court on a

25

26          [13] C/O Cangas' second entry is made at 1752 (5:52 p.m.), which states,
    "Talking/Moving OK."  Id.  However, there is no corresponding video surveillance footage,
27  as the second cell check took place during the one and a half-hour gap, when, according to
    the County Defendants, there was "no motion" in the cell.  This factual discrepancy further
28  supports the denial of summary judgment for C/O Cangas.

motion for summary judgment.  Thus, the Court DENIES the County Defendants' motion for summary judgment as to C/O Christensen.

### 4.   C/O Morgan

C/O Morgan was not on duty when the Decedent arrived at the HCCF, and did not see him until she conducted her first cell check at 1807 (6:07 p.m.).  Morgan Decl. ¶ 3; Rossiter Decl. Ex. A.  At a point in time not specified by the parties, C/O Morgan processed the Decedent's booking paperwork and noticed that "there was no medical form in the bucket."  Sarmiento Decl. Ex. L at 45:8-21.  There were no other C/Os present for C/O Morgan to ascertain the reason a medical screening form was not included with his booking documentation.  Id. at 45:19-24.  Nonetheless, she advised her supervisor of this fact, as she was trained to do.  Id. at 45:11-49:6.  C/O Morgan could not recall when she began processing the Decedent's booking paperwork or notified her supervisor regarding the missing medical form, or whether either occurred prior or subsequent to her cell check of the Decedent at 6:07 p.m.  Id. at 46:9-19.[14]

Plaintiffs fault C/O Morgan for failing to request a medical assessment when she conducted her cell check.  Pls.' Opp'n at 24.  C/O Morgan denies observing anything to suggest that the Decedent was in distress when she checked on him at 6:07 p.m.  During her deposition, C/O Morgan stated that she looked through the cell door and saw him lying on his side, and that she could see his chest "rising and falling."  Sarmiento Decl. Ex. L at 65:17-70:5.  Using her toe, C/O Morgan then tapped on the cell door.  Id. at 70:14-20.  C/O Morgan claims she observed "movement" by the Decedent and correspondingly entered the notation "moving" on the Observation Log.  Id.; Rossiter Decl. Ex. A.  However, there is a

---

[14] C/O Morgan testified during her deposition that upon seeing that no medical screening form had been prepared, she started to fill out the form by indicating his name and date.  Sarmiento Decl. Ex. L at 53:2-6.  The form was later signed by Nurse Laurie Grow.  Id. at 53:24-54:19.  In their reply, the County Defendants assert that Nurse Grow "did do an assessment within one hour of [the Decedent] being placed in the sobering cell."  County Defs.' Reply at 8.  No citation to the record is provided to support this factual assertion, as required by Rule 56(c)(1)(A).  In addition, Nurse Grow denies that she medically screened or assessed the Decedent.  Id. Ex. K at 47:15-20 ("I did not do a prescreening on him"); id. at 74:9-14 ("I never medically assessed Mr. Cotton that day.").

triable issue of fact as to the veracity of her purported observations.  At 6:07 p.m., the sobering cell surveillance camera was not in operation, ostensibly because there was "no motion" in the cell.  Sarmiento Decl. Ex. N at 17:10-19.  The County Defendants' explanation of why the surveillance camera was not recording the Decedent in the cell arguably conflicts with C/O Morgan's observation, as reflected in the Observation Log.  In view of this unexplained discrepancy, the Court DENIES Defendants' motion for summary judgment with respect to C/O Morgan.

### 5.    C/O Strong

On the day of the incident, C/O Strong's shift began at 5:45 p.m. with an initial briefing.  Strong Decl. ¶ 3.  At the briefing, there was no mention that the Decedent had suffered any injuries.  Id. ¶ 3.  C/O Strong first saw the Decedent in the sobering cell at 6:34 p.m. lying on his stomach.  Id.  He could see the Decedent breathing, and assumed that he was sleeping off whatever resulted in his placement in the holding cell.  Id.  On the Observation Log, C/O Strong made the notation "on stomach/breathing."  Rossiter Decl. Ex. A.

He next saw the Decedent at 7:02 p.m. lying on the floor, near the cell door.  Strong Decl. ¶ 3.  C/O Strong's attention was momentarily diverted to another detainee.  Id.  Upon his return to the Decedent's cell, C/O Strong noticed that the Decedent had not appeared to have moved from the location where he observed him during the first cell check.  Id.  At that point, C/O Strong banged on the door; when he received no response, he summoned additional correctional officers.  Id.  The officers opened the cell door, pulled the Decedent out of the cell, and a staff nurse began resuscitation efforts.  Id.  At no time was C/O Strong aware that the Decedent was in distress.  Id.

Plaintiffs fail to specifically discuss the basis of C/O Strong's liability, other than to note in passing that he allegedly failed to ensure that the Decedent was medically screened or assessed.  Pls.' Opp'n at 12, 19.  As an initial matter, Plaintiffs fail to establish that C/O Strong was aware that the Decedent had not been screened or assessed.  But even if they had, there is no evidence that such knowledge was sufficient for C/O Strong to conclude

that the Decedent was in need of immediate medical care, and ignored such need.  Rather, the record shows that C/O Strong was not aware of any medical issues relating to the Decedent.[15]  Because Plaintiffs have failed to demonstrate any triable issues of fact regarding C/O Strong's liability for deliberate indifference, the Court GRANTS summary judgment in his favor.

### C.    QUALIFIED IMMUNITY

As an alternative matter, the County Defendants contend that they are entitled to qualified immunity.  County Defs.' Mot. at 22-23.  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  The issue of qualified immunity generally entails a two-step process, which requires the court to first determine whether the defendant violated a constitutional right and then to determine whether that right was clearly established. Saucier v. Katz, 533 U.S. 194, 201-202 (2001).  In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court modified the Saucier test and "gave courts discretion to grant qualified immunity on the basis of the 'clearly established' prong alone, without deciding in the first instance whether any right had been violated."  James v. Rowlands, 606 F.3d 646, 650-51 (9th Cir. 2010) (discussing Saucier standard after Pearson).

The County Defendants contend that Plaintiffs cannot meet the first prong of the Saucier test on the grounds that they were subjectively unaware that the Decedent had a serious medical need requiring immediate attention.  Defs.' Mot. at 22.[16]  However, the facts germane to the individual County Defendants' actual awareness are in dispute.  If there are disputed issues of material fact underlying the issue of qualified immunity, the court must adopt the version of the facts presented by, and draw all reasonable inferences in

---

[15] Unlike the other individual County Defendants, C/O Strong did not report on the Observation Log that the Decedent was moving in his cell, and Plaintiffs do not argue that such notation conflicts with the video surveillance recordings.

[16] The County Defendants do not dispute that the Decedent's Fourth Amendment rights in this context were clearly established at the time of the incident.

favor of, the non-movant.  Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).  Here, as set forth above, a jury could find that the individual County Defendants were deliberately indifferent to the Decedent's serious medical needs.  Accordingly, the County Defendants' motion for summary judgment is DENIED, insofar as it is based on the doctrine of qualified immunity.  See Espinosa v. City and County of San Francisco, 598 F.3d 528, 533 (9th Cir. 2010) ("The district court properly denied defendants' summary judgment motion on whether they were entitled to qualified immunity for the warrantless entry and search of the apartment because there are questions of fact regarding the first prong of the qualified immunity test, i.e., whether the officers violated Sullivan's Fourth Amendment rights.").

### D.   CLAIMS AGAINST THE COUNTY

There is no respondeat superior liability under 42 U.S.C. § 1983.  Monell v. Dep't of Soc. Serv. of N.Y., 436 U.S. 658, 692 (1978).  Instead, to establish municipal liability under § 1983, the plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  In "limited circumstances," a plaintiff may establish such liability based on a "failure to train" claim.  City of Canton v. Harris, 489 U.S. 378, 387 (1989).  "[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton, 489 U.S. at 388.  "Failure to train may amount to a policy of 'deliberate indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional rights likely."  Dougherty v. City of Covina, -- F.3d --, 2011 WL 3583404, at *6 (9th Cir. Aug. 16, 2011) (citing City of Canton, 489 U.S. at 390).

Plaintiffs fail to proffer specific evidence regarding the County's training policies, any particular deficiencies in those policies or the particular training received by the individual County defendants, pursuant to such policies.  See City of Canton, 489 U.S. at 391 (holding that "the identified deficiency in a city's training program must be closely related to the ultimate injury"); Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir.

2007) (requiring that the municipality had a training policy that amounts to deliberate indifference to the constitutional rights of the persons with whom its employees are likely to come into contact).[17]  Instead, Plaintiffs rely almost entirely on the report of Karen Lovie, Jail Compliance Officer for the HHCF, who investigated the Decedent's death and concluded, inter alia, that HCCF personnel failed to conduct a medical prescreening and performed cell checks in a manner inconsistent with HCCF policy.  Pl.'s Opp'n at 21-22.  Though not entirely clear, Plaintiffs appear to argue that had the C/Os been trained properly, they would have followed the HCCF's policies.  Id.  However, the lack of training, standing alone, does not amount to a constitutional violation.  See City of Canton, 489 U.S. at 390-391 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."); Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001) (noting that the failure to train must result from a conscious or deliberate choice to follow a course of action made from among various alternatives).

Moreover, a single incident cannot sustain a failure to train except in the "rare" circumstance that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  Connick, 131 S.Ct. at 1361 (noting that the Canton court hypothesized that a failure to train claim could be shown where the municipality "arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force.").  Here, Plaintiffs have failed to proffer evidence of a pattern of violations and have not raised any triable issues of fact as to the allegedly obvious inadequacy of the County's training policies or that such inadequacy was likely to result in a constitutional violation.  The Court

---

[17] In fact, Plaintiffs' expert Roger Clark admitted during his deposition that he had no opinion regarding the adequacy of the C/O's training, since he did not review their training records.  Bragg Decl. Ex. A at 81:11-14.

therefore GRANTS summary judgment in favor of the County on Plaintiffs' third claim for municipal liability under § 1983.[18]

## IV.   CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.   OVERVIEW

The City Defendants move for summary judgment as to the following:  (1) all claims alleged against Officers Jones and Watson; (2) the second claim for deliberate indifference to serious medical needs; (3) the third claim for violation of California Government Code § 845.6; (4) the eighth claim for loss of familial association in violation of the fourteenth amendment; and (5) all claims brought by Martin Cotton Sr., other than the eighth claim under the fourteenth amendment.

### B.   CLAIMS AGAINST OFFICERS JONES AND WATSON

#### 1.   Excessive Force

##### a)   *Officer Watson*

Plaintiffs predicate their excessive force claim against Officers Watson on his allegedly unnecessary placement of a spit mask on the Decedent.  Pls.' Opp'n at 11.[19] According to Plaintiffs, none of the officers saw the Decedent spit, and therefore, there was no need for its application.  They further assert that the use of the mask was excessive given that the Decedent still had pepper spray on his face.  Id.  In addition, Plaintiffs aver that he failed to intervene to stop the other officer's use of force against the Decedent, and did not seek medical assistance or offer to wash the pepper spray off of his face.  Id.

As support for their position, Plaintiffs rely principally on the declaration of their use of force expert, Roger Clark, who offers the following opinion:

---

[18] Because there is no basis for imposing municipal liability, the Court's ruling also resolves Plaintiffs' sixth cause of action for wrongful death damages and seventh cause of action for survival damages in favor of the County.

[19] City Defendants provided an exemplar of a spit mask, which is a sheer nylon mesh appliance applied over the face to prevent spitting.  Supp. Laird Decl. Ex. B.  Officer Watson applied the mask at the request of another officer.  Watson Decl. ¶ 6.  Even after applying the mask, the Decedent continued to yell, thus indicating that it did not impede his ability to breathe.  Id.

> A spit masked [sic] was placed on Mr. Cotton by Officer Watson while in the field, *but none of the EPD Officers reported any spitting by Mr. Cotton neither in their statements nor depositions.…* In my opinion, Officer Watson's use of the spit mask was excessive and unreasonable under the circumstances,.…

Clark Decl. ¶ 14 (emphasis added), Dkt. 186. However, Mr. Clark admitted during his deposition that he, in fact, had not reviewed all of the officers' statements because they were not given to him by Plaintiffs' counsel. Supp. Delaney Decl. Ex. B at 109:18-23, Dkt. 200. Had he done so, Mr. Clark would have realized that Officer Laird had, in fact, observed spittle coming from the Decedent's mouth. Supp. Laird Decl. Ex. A; Dulaney Decl. Ex. D at 21:17-19. A third party witness, Mr. Gage, also saw the Decedent spit at the officers. Dulaney Decl. Ex. D at 21:17-19. Notably, Mr. Clark acknowledged that if a witness had seen the Decedent spit at the officers, the application of a spit mask would have been appropriate. Supp. Delaney Decl. Ex. A at 106:5-9. Accordingly, the Court finds that Officer Watson's placement of the spit mask does not amount to excessive force, as a matter of law, based on the record presented. Summary judgment in favor of Officer Jones on this claim is therefore GRANTED.

### b)   *Officer Jones*

Officer Jones arrived at the scene after the Decedent had been handcuffed and had a spit mask placed over his face. Jones Decl. ¶ 2. He used his nunchukus as a "pain compliance" control hold to ensure the safety of the other officers while they searched the Decedent. Id. ¶ 4. Relying on the declaration of their expert, Plaintiffs contend that Officer Jones' use of the nunchukus was "excessive and unreasonable since he was intentionally causing pain after decedent had been beaten and after he was handcuffed." Clark Decl. ¶ 19. However, Mr. Clark failed to account for the fact that Officer Jones was seeking to gain control over the Decedent, who was continuing to resist the officers, even while handcuffed. Jones Decl. ¶ 4. Given the lack of dispute that the Decedent was actively resisting the officers when Officer Jones applied his nunchukus, Plaintiffs have failed to raise a triable issue of fact with respect to their excessive force claim against Officer Jones.

1   See Tatum v. City and County of San Francisco, 441 F.3d 1090, 1095 (9th Cir. 2006)

2   (noting that the fourth amendment does not, "prohibit a police officer's use of reasonable

3   force during an arrest.").[20]   Therefore, the City Defendants' motion for summary judgment

4   with respect to Plaintiffs' excessive force claim against Officer Jones is GRANTED.

5                    **2.      Failure to Intercede**

6        "[P]olice officers have a duty to intercede when their fellow officers violate the

7   constitutional rights of a suspect or other citizen." United States v. Koon, 34 F.3d 1416,

8   1446-47 n.25 (9th Cir. 1994), rev'd on other grounds by 518 U.S. 81, (1996).  "Importantly,

9   however, officers can be held liable for failing to intercede only if they had an opportunity

10  to intercede." Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000).  In addition,

11  the duty to stop a violation arises only where the officers knows or has reason to know of

12  the constitutional violation. Ting v. United States, 927 F.2d 1504, 1511 (9th Cir. 1991).

13       According to Plaintiffs, "[w]hen [Officers] Jones and Watson arrived, it was evident

14  that Mr. Cotton had been pepper sprayed and beaten, yet neither officer stepped in to

15  prevent further abuse…." Pls.' Opp'n at 13.  However, Plaintiffs cite no evidence to

16  support this contention.  Though Officer Watson saw Officer Laird strike the Decedent's

17  lower legs three times with his baton within seconds of his arrival, Watson Decl. ¶ 3, there

18  is no evidence that the Decedent suffered any "further abuse" after that point which either

19  Officer Watson or Officer Jones could have prevented.  Officer Jones only saw the other

20  officers applying compliance holds.  Jones Decl. ¶ 3.  In addition, there is no evidence that

21  these officers knew or had reason to know that the other officers were violating the

22  Decedent's constitutional rights.  For these reasons, the City Defendants' motion for

23  summary judgment with respect to Plaintiffs' failure to intercede against Officers Jones and

24  Watson is GRANTED.

25

26  _____

27      [20] Plaintiffs' contention regarding Officer Jones' use of nunchakus is not alleged in
    the pleadings.  In addition, such claim is inconsistent with Mr. Clark's deposition
    testimony, wherein he stated that he was not criticizing such conduct.  Supp. Delaney Decl.

28  Ex. B at 46:2-8.

### 3.      Deliberate Indifference to Serious Medical Needs

Separately, Plaintiffs briefly argue that Officers Watson and Jones were deliberately indifferent to the Decedent's serious medical needs.  Pls.' Opp'n at 14.  However, Plaintiff makes no showing that either individual was subjectively aware that the Decedent was in need of medical attention.  It is undisputed that neither officer was present at the inception of the altercation.  Officer Watson arrived well after the incident was underway and only observed the three baton strikes to the Decedent's lower legs by Officer Laird.  Watson Decl. ¶ 3.  Officer Jones arrived even later, after the Decedent had already been handcuffed and placed in the spit mask.  Jones Decl. ¶ 2.  In light of Plaintiffs' failure to make the requisite showing under <u>Farmer</u> and its progeny as to these officers' subjective knowledge, summary judgment in their favor on Plaintiffs' second claims for deliberate indifference is GRANTED.

### C.      DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

Plaintiffs' second claim for deliberate indifference is brought against the individual City Defendants.  As noted, this Circuit has made clear that deliberate indifference may be shown where law enforcement officers "deny, delay or intentionally interfere with medical treatment [.]"  <u>Jett</u>, 439 F.3d at 1096 (internal quotations and citation omitted).  The City Defendants contend that they were unaware that the Decedent required immediate medical attention at a hospital.  City Defs.' Mot. at 11.  However, in light of the severity of the beating Officers Laird, Winkle and Whitmer had allegedly just inflicted upon the Decedent—which included the multiple strikes to the head, multiple baton strikes, kicks and knee strikes by numerous officers—a reasonable trier of fact could conclude that these Defendant knew that the Decedent had serious medical needs requiring immediate attention, but failed to provide or seek any treatment for the Decedent.  Indeed, Officer Whitmer testified during his deposition that he offered to follow Officer Laird to the hospital, given what he knew had just transpired.  <u>See</u> Galipo Decl. Ex. 3 at 108:10-109:25.

1  The City Defendants' motion for summary judgment with respect to Plaintiffs' second

2  claim for deliberate indifference is DENIED.[21]

3      **D.    VIOLATION OF CALIFORNIA GOVERNMENT CODE § 845.6**

4          In their fifth claim for relief, Plaintiffs allege a claim against the City Defendants for

5  violation of California Government Code § 845.6.  Under this code section, "a public

6  employee, and the public entity where the employee is acting within the scope of his

7  employment, is liable if the employee knows or has reason to know that the prisoner is in

8  need of immediate medical care and he fails to take reasonable action to summon such

9  medical care."  Cal. Gov. Code § 845.6; Lucas v. County of Los Angeles, 47 Cal.App.4th

10  277, 288 (1996).  To state a claim for violation of § 845.6, a plaintiff "must establish three

11  elements: (1) the public employee knew or had reason to know of the need (2) for

12  immediate medical care, and (3) failed to reasonably summon such care."  Jett, 439 F.3d at

13  1099.  "Liability ... is limited to serious and obvious medical conditions requiring

14  immediate care[.]"  Watson v. State, 21 Cal.App.4th 836, 841 (1993).   As set forth above,

15  there is sufficient evidence from which a jury could infer that Officers Laird, Winkle and

16  Whitmer knew or had reason to know that the Decedent needed immediate medical

17  attention but failed to reasonable summon care for him.  The City Defendants' motion for

18  summary judgment with respect to Plaintiffs' claim for violation of California Government

19  Code § 845.6 is therefore DENIED.

20      **E.    LOSS OF FAMILIAL ASSOCIATION**

21          The Ninth Circuit "has recognized that parents have a Fourteenth Amendment

22  liberty interest in the companionship and society of their children."  Wilkinson v.

23  Torres, 610 F.3d 546, 554 (9th Cir. 2010).  "Official conduct that 'shocks the conscience'

24  in depriving parents of that interest is cognizable as a violation of due process."  Id.  The

25  shock the conscience test may be met by showing that a defendant acted with deliberate

26

27          [21] Officers Watson and Jones are entitled to summary judgment on this claim for the
    same reasons discussed above in connection with Plaintiffs' claim for deliberate
28  indifference to serious medical needs.

1  indifference or by showing that he acted with a "purpose to harm" the decedent for reasons

2  unrelated to legitimate law enforcement objectives.  Porter v. Osborn, 546 F.3d 1131, 1137

3  (9th Cir. 2008).  If the officers had the opportunity for actual deliberation, the deliberate

4  indifference standard applies; but if there was not sufficient time for such deliberation, then

5  the plaintiff must satisfy the more stringent purpose to harm standard.  Id. at 1137-40.  To

6  satisfy the purpose to harm standard, a plaintiff must show "the intent to inflict force

7  beyond that which is required by a legitimate law enforcement objective."  Id. at 1140

8  (citations and internal quotations omitted).

9       The parties dispute which standard, i.e., deliberate indifference or "purpose to

10  harm," applies under the facts presented.  "In determining whether deliberate indifference is

11  sufficient to shock the conscience, or whether the more demanding standard of purpose to

12  harm is required, the critical consideration is whether the circumstances are such that actual

13  deliberation is practical."  Tennison v. City and County of San Francisco, 570 F.3d 1078,

14  1089 (9th Cir. 2009) (internal quotation marks and brackets omitted).  Thus, for example,

15  the Ninth Circuit has recognized that in situations where law enforcement officers are

16  required to "react quickly," the purpose to harm standard applies.  Osborn, 546 F.3d at

17  1139-40.  In Osborn, a police officer shot and killed the plaintiffs' son following a five-

18  minute altercation.  Id.  The court held that the purpose to harm standard "must apply"

19  given that the officer "faced an evolving set of circumstances that took place over a short

20  time period necessitating 'fast action' and presenting 'obligations that tend to tug against

21  each other.'"  Id. (quoting in part County of Sacramento v. Lewis, 523 U.S. 833, 853

22  (1998)).   In contrast, the lesser, deliberate indifference standard is limited to situations in

23  which "actual deliberations are practical," such as where the "split second" decisions are

24  not involved.  E.g., Tennison, 570 F.3d at 1089 ("the decision whether to disclose or

25  withhold exculpatory evidence is a situation in which 'actual deliberation is practical.'").

26       The Court finds that there is a triable issue of fact regarding whether "actual

27  deliberations" were practical under the circumstances presented.  Michael Gage, who was

28  present and witnessed the altercation, testified during his deposition that the Decedent was

not resisting, attacking or challenging the Police Officers.  Galipo Decl. Ex. 5 at 9:19, 12:10-15:13.  Construing the evidence in a light most favorable to Plaintiffs, it is possible that a trier of fact could conclude that, in light of the lack of resistance from the Decedent, the officers, in fact, had sufficient time to actually deliberate regarding their course of conduct.  The City Defendants counter that the incident lasted only a couple of minutes, and therefore, the altercation was the type where split second decisions by the Police Officers were necessary.  However, even if the altercation lasted only a few minutes, a reasonable juror could conclude that actual deliberations were nonetheless practical, given that the Decedent was not resisting the officers.[22]

But even if the more stringent purpose to harm standard were controlling, the Court finds that Plaintiffs have demonstrated that there are genuine disputes of material fact with respect to whether the Police Officers exhibited "the intent to inflict force beyond that which is required by a legitimate law enforcement objective."  Porter, 546 F.3d at 1140. Mr. Gage, a percipient witness to the incident, observed the Police Officer pepper spray the Decedent in his face and strike the side of his head, causing him to fall to the ground. Galipo Decl. Ex. 5 at 8:7-13, 9:13-19, 12:10-25, 13:1-22, 14:12-22.  While on the ground, the Decedent curled into a fetal position with his face towards the ground and was struck repeatedly with a baton by one of the officers.  Id. at 14:12-15, 15:1- 13.  After Officer Whitmer arrived, he joined in the fray by kicking the Decedent in the ribs.  Id. at 16:17-18:4; 41:17-42:10.  Mr. Gage also observed the officers delivering multiple knee strikes to the Decedent's mid-section.  Id. at 17:6-17.  In the meantime, other officers struck the Decedent multiple times in the back of the head with hammer fists.  Id. at 18:5-19:11. According to Mr. Gage, the Decedent never attempted to punch or kick any of the officers. Id. at 14:3-22, 20:11-17.  Likewise, witness Louis Valente observed one of the officers strike Mr. Cotton in the head up to seven times and saw several officers apply multiple "full

---

[22] The Court also notes that a reasonable jury could find that after the Decedent was handcuffed and restrained, there may have been the opportunity for actual deliberation with respect to the individual City Defendants' failure to summon medical care.

1  force" kicks and baton strikes to Mr. Cotton while Mr. Cotton was on the ground.  Id. Ex. 6

2  ¶ 8.[23]  And, as discussed above, the autopsy report on the Decedent confirmed that he

3  suffered significant blunt force trauma throughout his body.  Galipo Decl. Ex. 8.

4          From these facts, a reasonable juror could conclude that the Police Officers acted

5  with the requisite purpose to harm the Decedent necessary to sustain Plaintiffs' claim under

6  the fourteenth amendment.  The City Defendants' motion for summary judgment with

7  respect to Plaintiffs' § 1983 claim for denial of familial association under the fourteenth

8  amendment is therefore DENIED.

9          **F.      CLAIMS OF MR. COTTON SR.**

10         Finally, the City Defendants contend that the Decedent's father, Martin Cotton Sr.,

11 lacks standing to recover survival or wrongful death damages with respect to all claims

12 except Plaintiffs' eighth claim under the fourteenth amendment.  City Defs.' Mot. at 19-21.

13 The Court agrees.  In its Order on the parties' motions in limine, the Court ruled that the

14 *only* claim alleged in the FAC which Mr. Cotton Sr. has standing to pursue is the eight

15 claim for violation of the right to familial association under the fourteenth amendment.  See

16 12/14/10 Order at 34-37, Dkt. 147.  Consistent with that ruling, the City Defendants'

17 motion for summary judgment with respect to Mr. Cotton Sr. is GRANTED.

18 **V.     CONCLUSION**

19         For the reasons stated above,

20         IT IS HEREBY ORDERED THAT:

21         1.      The County Defendants' motion for summary judgment is GRANTED IN

22 PART and DENIED IN PART, as follows:

23                 a.      Plaintiffs are DENIED leave to amend to allege a claim for excessive

24         force under 42 U.S.C. § 1983 against the individual County Defendants, and

25         therefore, the County Defendants' motion for summary judgment on said putative

26         claim is DENIED AS MOOT.

27 ────────────────

28         [23] In describing the incident, Mr. Valente stated:  "I felt like I was seeing the images of the Rodney King beating all over again."  Galipo Decl. Ex. 6 ¶ 15.

          b.       GRANTED as to Plaintiffs' second claim for deliberate indifference to serious medical needs with respect to C/O Strong, but DENIED as to all other individual County Defendants.

          c.       GRANTED as to Plaintiffs' <u>Monell</u> claim against the County.

2.     The City Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, as follows:

          a.       GRANTED as to all claims alleged against Officers Jones and Watson.

          b.       DENIED as to Plaintiffs' second claim for deliberate indifference to serious medical needs.

          c.       DENIED as to Plaintiffs' third claim for violation of California Government Code § 845.6.

          d.       DENIED as to Plaintiffs' eighth claim for loss of familial association in violation of the fourteenth amendment.

          e.       GRANTED as to all claims brought by Martin Cotton Sr., other than Plaintiffs' eighth claim under the fourteenth amendment.

3.     In view of the Court's ruling on the instant motions, the Court finds the parties should be able to conclude the trial in a time period significantly less than the eight trial days currently allotted for this case.  At the pretrial conference, the parties shall be prepared discuss a revised time estimate for trial, along with a proposed time allocation between the parties.

4.     No further motions or requests may be filed without prior leave of Court.

5.     This Order terminates Docket 167 and 178.

IT IS SO ORDERED.

Dated:  August 31, 2011

                          *Saundra B Armstrong*
                          SAUNDRA BROWN ARMSTRONG
                          United States District Judge